[671 NYS2d 1]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROHEE SIBADAN, Appellant.

First Department, March° 10, 1998

### APPEARANCES OF COUNSEL

*David M. Cohn* of counsel *(Rona Feinberg* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

*Robert C. Gottlieb* of counsel *(Myra Derkatch Rochelson* on the brief), for appellant.

### OPINION OF THE COURT

MAZZARELLI, J.

Defendant was convicted of conspiring to kill his son-in-law.

The evidence at trial established that defendant strenuously objected to his 21-year-old daughter's relationship and subsequent marriage to Fizul Khan (Khan), defendant's former employee. After the daughter moved from her parents' home in August 1994, defendant attempted to learn where his daughter and Khan were living, and made violent threats to Khan. On one occasion, defendant choked his daughter after she refused to divulge her address, and subsequently offered Khan, who was waiting outside in a car, $100 to reveal it. When Khan also refused, defendant told his son to write down Khan's license plate number.

In September 1994, defendant enlisted the aid of Fogarty George, a long-time acquaintance, in his plot to have Khan shot. George was a drug dealer who dealt in kilogram quantities of cocaine. He knew many of the drug gangs operating in the area of Manhattan where he also owned a sporting goods store. Defendant told George that one of his employees had stolen $20,000, and asked George to find him a "gun-man or hit man" to shoot this employee. George agreed, and defendant gave him a photocopy of a picture of Khan, Khan's address and beeper number, the name of the car service where Khan worked and his hours of employment. George, in turn, contacted Raymond Rivera, Jr., also known as "Dilly," who was a member of the YTC drug gang. George told Dilly that he had a job for him to "kill somebody," and gave Dilly the photocopy of Khan's picture and the other information regarding Khan.[1]

Ultimately, Dilly, fearful that he was the subject of a contract by other drug dealers, contacted the District Attorney's office and was referred to Detective Mshar of the Homicide Investigation Unit (HIU). Dilly told Mshar about George's request for a hit and gave Mshar the photocopied picture of Khan. After Dilly engaged in several tape-recorded conversations with George concerning the plan to kill Kahn, George and defendant were arrested. The shooting never occurred. The photocopied pictures of Khan, and pieces of paper with information relating to Khan written in defendant's handwriting, were recovered from both George and defendant upon their arrest. Defendant's conviction of conspiracy in the second and fourth degrees was obtained largely through the testimony of George and Dilly, pursuant to cooperation agreements with the prosecution.

---

1. Defendant did not testify at trial, but he did introduce evidence attempting to show that he told George to get someone to give Khan "a good beating," rather than killing him.

On appeal, defendant contends that the trial court should have granted his CPL 440.10 motion to vacate the judgment on the ground of newly discovered evidence, namely, the prosecution's failure to disclose certain *Brady* material (*see, Brady v Maryland*, 373 US 83). Defendant argues that despite his specific requests for disclosure of any cooperation agreements or promises made to George or any other witnesses in exchange for their testimony, the People failed to reveal George's cooperation with the Homicide Investigation Unit on prior unrelated matters between 1993 and 1994. Defendant does not dispute that the People fully disclosed the terms of the cooperation agreement between George and the District Attorney's office regarding his testimony in this case. That agreement would permit him to plead guilty to the lesser charge of conspiracy in the fourth degree, with a recommendation by the People of a sentence of no more than 1 to 3 years.

In support of the motion, defendant offered excerpts of George's testimony in an unrelated prosecution that occurred after the verdict in this case in 1995. In that testimony, George stated that in 1993 he declined a request by Federal Drug Enforcement Agency (DEA) agents to participate in a sting operation. However, he admitted providing information in 1993 to a specific prosecutor in HIU, Assistant District Attorney (ADA) Camacho, regarding the YTC gang. He also testified that in April-May 1994 he provided additional information about a dispute between members of the YTC gang and one of its members. Defendant argues that George's prior cooperation with HIU would have constituted significant impeachment evidence as it suggested a motive on George's part to "frame" defendant to improve his own position with the authorities.

In opposition, the prosecution submitted an affidavit of ADA Camacho. He stated that George was not a confidential informant for HIU in September 1994 when he was arrested, and "Fogarty George had not provided me with information prior to his arrest." The motion court denied defendant's CPL 440.10 motion, finding that no cooperation agreement with the DEA was established in the record, and "there is no evidence of a prior undisclosed agreement between the prosecution and [George]." The court further ruled that assuming George had previously cooperated with the DEA, no *Brady* violation occurred because no exculpatory material was in the possession of the People.

We affirm the denial of defendant's motion to vacate the judgment, but for different reasons. "A defendant has the right,

guaranteed by the Due Process Clauses of the Federal and State Constitutions, to discover favorable evidence in the People's possession which is material to guilt or punishment (*Brady v Maryland*, [373 US 83]; *People v Vilardi*, 76 NY2d 67, 73)." (*People v Scott*, 88 NY2d 888, 890). The prosecution's duty to disclose *Brady* material applies to evidence affecting the credibility of a government witness, including evidence of any agreement or promises of leniency given to the witness in exchange for favorable testimony against an accused (*People v Steadman*, 82 NY2d 1, 7; *People v Novoa*, 70 NY2d 490, 496; *People v Cwikla*, 46 NY2d 434, 441; *Giglio v United States*, 405 US 150, 153-154).

The defendant, through his counsel, did make a specific request for the undisclosed material (*see, People v Scott, supra,* at 890). In his demand for discovery, defense counsel requested any material constitutionally required to be disclosed including "any and all records, memorandum and correspondence between the witnesses and law enforcement authorities which might reasonably reflect on the witness' motives and relationships with the District Attorney." We believe this broadly worded request would include a prosecution witness's prior informant status (*supra; see also, People v Wright*, 86 NY2d 591, 596-597). Thus, "[w]here the prosecutor has been made aware by a specific discovery request that defendant considered certain material important to the defense, the failure to disclose such evidence is governed by a 'reasonable possibility' standard of prejudice—i.e., a reasonable possibility that the outcome of the trial would have differed had the evidence been produced (*People v Vilardi*, [*supra*] at 77)." (*People v Scott, supra,* at 890-891.)

■ However, it is questionable whether George's prior contact with HIU constituted *Brady* material at all. Although in *People v Wright* (*supra*), the Court of Appeals concluded that a prosecution witness's prior activity as a police informant constituted *Brady* material under the unique facts of that case, to be discussed *infra*, it did not establish a blanket rule. Indeed, such a rule would be inconsistent with prior interpretations of the scope of the prosecutor's duty to disclose agreements and/or promises made to witnesses in exchange for their testimony (*see, People v Novoa, supra; People v Piazza*, 48 NY2d 151, 163; *People v Matos*, 221 AD2d 277, *lv denied* 87 NY2d 1022; *see also, People v St. John*, 89 NY2d 1018). Generally, the prosecutor's disclosure obligation arises only where "the prosecutor and the witness have reached an understanding in

which the witness's cooperation has been exchanged for some *quid pro quo* on the part of the prosecutor" (*People v Novoa, supra,* at 497), or where there is any other indication that the witness' cooperation "was bargained for, directly or indirectly" (*People v Piazza, supra,* at 163; *People v Matos, supra,* at 278).

As the People argue, there is no evidence that George was promised anything for his previous cooperation. Certainly, defendant's prior cooperation bore no relation to his agreement to testify in this case. The terms of George's cooperation agreement, fully disclosed to the defense, make this entirely clear. Thus, standing alone, the fact that George was previously an informant for HIU does not establish any agreement or understanding that George would receive any benefits for the information he provided (*see, People v Matos, supra*).

Even if we considered George's prior contacts with HIU *Brady* material, reversal would not be required as there is no reasonable possibility that had the information been disclosed the outcome of the proceeding would have been different (*see, People v Scott, supra; People v Vilardi,* 76 NY2d 67, *supra*). Clearly, the jury's awareness that George was receiving a favorable plea agreement in exchange for his testimony against defendant was far more crucial in assessing his credibility than his prior contacts with HIU. In this sense, the impeachment value of George's prior activities would have been cumulative. Defense counsel's cross-examination of George concerning his heavy involvement in the drug trade and the leniency George received in exchange for his cooperation in this case provided ample basis for the jury to question George's reliability as a witness (*see, People v Richards,* 184 AD2d 222, 222-223, *lv denied* 80 NY2d 1029 [no reasonable possibility that failure to disclose witness's two convictions contributed to the verdict where witness extensively cross-examined, his testimony was corroborated by other witnesses and his credibility challenged in the defense summation]; *see also, United States v Amiel,* 95 F3d 135, 145-146 [2d Cir 1996] [suppressed evidence not material when it merely furnishes an additional basis to impeach a witness whose credibility is already shown to be questionable]; *United States v Diaz,* 922 F2d 998, 1007 [2d Cir 1990], *cert denied* 500 US 925).

More significantly, there was overwhelming evidence establishing defendant's role in the conspiracy, much of it unconnected to George (*see, People v Martin,* — AD2d —, 1998 NY Slip Op 01396 [1st Dept, Feb. 10, 1998] [impeachment value of arresting officers' misconduct does not require vacatur of plea

where officers' testimony was not sole source of defendant's guilt]). Defendant's daughter and Khan provided detailed background testimony concerning defendant's anger over their relationship, and his persistent attempts to ascertain their address. Dilly's testimony, also secured pursuant to a cooperation agreement, was entirely consistent with George's regarding the plot to shoot Khan. Moreover, several of the conversations between Dilly and George about the details of the planned murder were tape recorded by detectives, thereby providing objective corroboration of the conspiracy. Further, defendant's connection to the plot was convincingly shown by the recovery of Khan's picture, and notes handwritten by defendant with information about Khan, from both defendant and George on their arrest. There was a mountain of evidence demonstrating defendant's guilt and there is no reasonable possibility that cumulative impeachment evidence would have produced a verdict more favorable to defendant (*cf., People v Grice*, 188 AD2d 397, *lv denied* 81 NY2d 840).[2]

Defendant's reliance on *People v Wright* (86 NY2d 591, *supra*) is misplaced. In *Wright*, the crucial issue was whether the female defendant assaulted the male complainant with a knife, or whether the female was acting in self-defense to fend off a sexual attack. A contemporaneous notation made by the arresting officer favored the defendant's version of the events, while at trial, the officer testified at variance with the notation, favorable to the complainant. After the jury convicted the defendant, she moved to vacate the judgment on the ground that the prosecution failed to disclose *Brady* material, namely, the fact that the complainant had previously been an informant for the local police department. The Court of Appeals reversed the conviction, finding that in a case where credibility was the critical issue, the defendant, under the circumstances presented, was prejudiced by the prosecution's failure to disclose the complainant's prior informant status, which was *Brady* material. Had the complainant's previous relationship with the same police department been disclosed, the Court reasoned, the defense would have been able to present viable explanations to the jury as to why the police believed the complainant's

---

2. For similar reasons, we do not believe reversible error occurred when George testified that he first cooperated with HIU on the night of his arrest, and when the prosecutor attempted to buttress George's credibility by arguing the same point during her summation. While the prosecutor does have a duty to correct misleading testimony (*People v Steadman, supra,* at 7; *People v Savvides*, 1 NY2d 554), the record suggests that these representations related only to this specific case, and therefore were not misleading.

version rather than the defendant's, and why the officers' testimony deviated from their pretrial statements favoring defendant (*supra,* at 596-598). Thus, a fertile avenue of defense was precluded by the People's nondisclosure.

George's status as an informant had no similar relevance to the issues in this case. While his testimony was clearly important, George was not the only witness establishing defendant's complicity in the conspiracy. Defendant's suggestion that George's prior-informant status gave him a motive to frame defendant so as to curry favor with the prosecution is completely undermined by his daughter's and Khan's testimony, which established a clear motive for defendant's desire to cause harm to his son-in-law. Indeed, given the independent evidence establishing the existence of a conspiracy, a claim that George framed the defendant is totally specious.

■ Defendant next contends that the prosecutor improperly introduced evidence of uncharged crimes during her opening statement by telling the jury that defendant choked his daughter when she refused to reveal her and Khan's address. Defendant argues that this was especially egregious misconduct since the prosecutor never mentioned the choking incident during her pretrial application when she sought permission to introduce other uncharged crimes evidence (*see, People v Molineux,* 168 NY 264). Defense counsel objected to the comment during the prosecutor's opening statement, and requested a *Ventimiglia* hearing at a subsequent sidebar (*see, People v Ventimiglia,* 52 NY2d 350, 361-362). The court denied the request, and defendant never objected when the testimony was elicited during the trial.

While we agree that the prosecutor should have sought an advance ruling from the court as to the admissibility of the choking incident (*People v Ventimiglia, supra*), such failure was immaterial because the testimony was plainly admissible in this case (*see, People v Ramos,* 220 AD2d 330, *lv denied* 87 NY2d 976; *People v Marte,* 207 AD2d 314, 316, *lv denied* 84 NY2d 937). Since the evidence showed that the relationship between defendant's daughter and Khan, and more specifically their refusal to tell defendant their address, fueled the conspiracy to shoot Khan, the choking incident was relevant to the issue of defendant's motive, and his intent to commit the charged crimes (*see, People v Till,* 87 NY2d 835, 837; *People v Chadwick,* 227 AD2d 123, 124, *lv denied* 88 NY2d 981; *People v Bernard,* 224 AD2d 192, 193, *lv denied* 88 NY2d 964), and to provide necessary background information (*see, People v Till,*

*supra; People v Chadwick, supra*). The probative value of this evidence clearly outweighed its potential for prejudice.

■ Nor was it error for the court to preclude defense counsel from cross-examining a police witness as to defendant's postarrest statement that he "just wanted [Khan] to get a good beating." While defendant contends that the statement was admissible as declaration against penal interest (*see, People v Brensic*, 70 NY2d 9, 15), a party's self-serving, hearsay statements are generally inadmissible when offered in his or her favor at trial (*People v Oliphant*, 201 AD2d 590, 590-591, *lv denied* 83 NY2d 875; *see also, People v Williams*, 216 AD2d 32, 33, *lv denied* 86 NY2d 805). Moreover, where a defendant's statement is largely exculpatory and the circumstances suggest that it is intended to minimize criminal involvement, it is not " 'clearly opposed to the declarant's interest' " (*People v Ferguson*, 154 AD2d 706, 707, *lv denied* 76 NY2d 788, *cert denied* 498 US 947, quoting *People v Crimi*, 137 AD2d 702, *lv denied* 71 NY2d 1025), and is therefore inadmissible. Defendant's statement in the present case falls within these parameters.

Furthermore, a criminal defendant may not create his unavailability by invoking his privilege against self-incrimination, and then seek to benefit therefrom by introducing his own prior hearsay statements not subject to cross-examination (*see, United States v Peterson*, 100 F3d 7, 13-14 [2d Cir 1996]; *United States v Kimball*, 15 F3d 54, 55-56 [5th Cir 1994], *cert denied* 513 US 999; *see also, People v Ely*, 164 AD2d 442, 445-446, *lv denied* 77 NY2d 905). For each of these reasons, the trial court properly denied introduction of this statement.

We perceive no abuse of sentencing discretion.

Defendant's remaining contentions are either unpreserved or without merit.

Accordingly, the judgment of the Supreme Court, New York County (Leslie Crocker Snyder, J.), rendered July 20, 1995, convicting defendant, after a jury trial, of conspiracy in the second and fourth degrees, and sentencing him to concurrent terms of 5 to 15 years and 1⅓ to 4 years, respectively, and order, same court and Justice, entered August 8, 1996, which denied defendant's CPL 440.10 motion to vacate the judgment, should be affirmed.

MILONAS, J. P., WALLACH and RUBIN, JJ., concur.

Judgment, Supreme Court, New York County, rendered July 20, 1995, and order, same court and Justice, entered August 8, 1996, affirmed.